Craig M. Peters (SBN 184018)
**ALTAIR LAW**
465 California Street, 5th Floor
San Francisco, CA 94104-3313
Telephone:  (415) 988-9828
Email: cpeters@altairlaw.us

David L. Fiol (SBN 203546)
**BRENT & FIOL, LLP**
1000 Fourth Street, Suite 580
San Rafael, CA  94901
Telephone:     (415) 839-8370
Email: dfiol@brentfiol.com

*Attorneys for Plaintiff Jack Francis Bruce*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK FRANCIS BRUCE, | Case No.  25-cv-01297-YGR |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES:** |
| vs. | **(1)  FALSE ARREST (42 U.S.C. § 1983)** |
| | **(2)  EXCESSIVE FORCE (42 U.S.C. § 1983)** |
| CITY OF HERCULES, OFFICER ANGEL GARCIA, OFFICER MICHAEL THOMPSON, OFFICER JOSHUA GOLDSTEIN, DANIEL COLLYER, RODEO-HERCULES FIRE PROTECTION DISTRICT, and DOES 1-20, | **(3)  AMERICANS WITH DISABILITIES ACT** |
| | **(4)  CALIFORNIA CIVIL CODE §52.1** |
| | **(5)  CALIFORNIA CIVIL CODE § 51.7** |
| | **(6)  COMMON LAW FALSE ARREST** |
| | **(7)  COMMON LAW BATTERY** |
| | **(8)  COMMON LAW NEGLIGENCE** |
| | **(9)  COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| Defendants. | **(10)  COMMON LAW DEFAMATION** |
| | **(11)  MEDICAL GROSS NEGLIGENCE** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff JACK FRANCIS BRUCE by and through his attorneys, ALTAIR LAW and BRENT & FIOL, LLP, for his First Amended Complaint against defendants, states as follows:

## I.    INTRODUCTION

1.      On April 1, 2024, plaintiff JACK FRANCIS BRUCE ("PLAINTIFF") was driving home after visiting his grandmother when, for the first time in his life, he suffered a tonic-clonic (previously known as a *grand mal*) brain seizure.  PLAINTIFF's car slowed and rolled to the roadway shoulder,

1

and then down a short embankment until it was stopped by small trees.  Two other drivers stopped to assist PLAINTIFF, who was uninjured but unresponsive.  One of them ran to PLAINTIFF'S car and was able to turn it off and take the keys, as PLAINTIFF continued to be in throes of a seizure.  The other called  911 and expressly stated that PLAINTIFF appeared to be having a seizure - a fact that was conveyed by dispatchers to both police and medical responders. Fortunately, the seizure and resulting accident caused no injuries or significant damage.

2.    While the *car accident* caused no injuries, the *first responders* did. Three Hercules Police Department officers, defendants ANGEL GARCIA ("GARCIA"), MICHAEL THOMPSON ("THOMPSON") and JOSHUA GOLDSTEIN ("GOLDSTEIN"), responded to the scene.  All three were on notice that PLAINTIFF appeared to be suffering from an epileptic seizure and, when they encountered him, they saw that he was rendered incoherent and unable to respond by the seizure.  As they spoke to him, he either spoke nonsense or fell asleep from exhaustion.

3.    Defendant DANIEL COLLYER ("COLLYER"), a paramedic employed by defendant RODEO-HERCULES FIRE PROTECTION DISTRICT ("RHFPD"), also responded to the scene, and at that point became responsible for PLAINTIFF'S care under California law.

4.    Like the officers, COLLYER was fully aware that PLAINTIFF was reported to be suffering from a seizure.  COLLYER heard the same dispatch reports as the three officers, was told by defendant GARCIA immediately upon his arrival that PLAINTIFF appeared to be suffering from a seizure, and could see with his own eyes that PLAINTIFF displayed typical signs of being in the postictal phase of a seizure, including confusion, exhaustion, and profuse sweating.  GARCIA also told COLLYER there was no evidence PLAINTIFF used alcohol or drugs.

5.    The individual defendants were trained and knew that the last thing to do when dealing with a seizure victim is restrain him, because seizure victims often react instinctively to physical contact.  Ignoring this training, the officers repeatedly poked, prodded, shook, and yelled at PLAINTIFF, ordering him to leave his car.   When that did not work, because PLAINTIFF had not yet recovered the ability to understand what was happening around him, the officers, with COLLYER's blessing, escalated, and began to forcefully extract him from the car.  Still suffering from his seizure and confused as to what was happening, PLAINTIFF instinctively resisted their efforts. This resulted in

2

THOMPSON unleashing a string of profanities at PLAINTIFF that even his normally-protective supervisors found to be unprofessional.  Unfazed and unmoved by the folly and error of their own behavior, the officers doubled down and forcefully pulled on, punched, kneed and tased PLAINTIFF, leaving him bloodied by multiple cuts and contusions. PLAINTIFF suffered back injuries that still plague him months  later.  Even after the scene turned shockingly violent, COLLYER said nothing.

6.      To make matters worse, defendants GARCIA and THOMPSON (curiously not joined by GOLDSTEIN) composed an incident report that was designed to cover up their senseless use of force by suggesting that they had probable cause to believe PLAINTIFF was driving under the influence. That report contained multiple falsehoods and calculated omissions designed to create the false impression that PLAINTIFF had attacked them and should be charged with criminal offenses, when the truth was quite the opposite.  *They* attacked *him*.

7.      The two officers' falsehood-ridden reports were submitted to the Contra Costa District Attorney and, as a result, caused PLAINTIFF to fear he would face criminal charges for four months after the incident, compounding the stress he was already suffering from his new diagnosis of epilepsy. PLAINTIFF brings this action to hold defendants accountable for their misconduct and to raise public awareness of the need for law enforcement officers to recognize and appropriately deal with the innocent victims of brain seizures.

8.      Not to be outdone, COLLYER wrote a report that falsely claimed PLAINTIFF was combative upon his arrival and attributed to PLAINTIFF a threatening statement that PLAINTIFF never made.

## II.    JURISDICTION

9.      Subject matter jurisdiction over the claims stated in this action is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and(4), and the aforementioned statutory and constitutional provisions. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy under Article III of the United States Constitution.

## III.    INTRADISTRICT ASSIGNMENT

10.     All of the events and/or omissions complained of herein occurred in Contra Costa

County, and this action is properly assigned to the Oakland or San Francisco Division.

**IV.     FACTS COMMON TO ALL CAUSES OF ACTION**

**A.  PARTIES**

11.     PLAINTIFF is and at all relevant times was a resident of Contra Costa County, State of California.  At the time of the incident he was 21 years old.

12.     Defendant CITY OF HERCULES ("HERCULES") was at all relevant times a municipal corporation organized under the laws of the State of California.   HERCULES operates a police department that, at all relevant times, was the employer of the named and DOE police officer defendants.

13.     Defendant GARCIA was at all relevant times employed by defendant HERCULES to work as a uniformed police officer with a rank of patrol officer, subject to oversight and supervision by HERCULES elected and non-elected officials, and acted under the color of the laws, statutes, ordinances, regulations, policies, and customs of the State of California.

14.     Defendant THOMPSON was at all relevant times employed by defendant HERCULES to work as a uniformed police officer, with a rank of corporal, subject to oversight and supervision by HERCULES elected and non-elected officials, and acted under the color of the laws, statutes, ordinances, regulations, policies, and customs of the State of California.  Four months after the subject incident, he was promoted to the rank of sergeant.

15.     Defendant GOLDSTEIN was at all relevant times employed by defendant HERCULES to work as a uniformed police officer, with a rank of patrol officer, subject to oversight and supervision by HERCULES elected and non-elected officials, and acted under the color of the laws, statutes, ordinances, regulations, policies, and customs of the State of California.

16.     Defendant COLLYER was at all relevant times employed by defendant RHFPD to work as a uniformed firefighter and paramedic.

17.     Defendant RHFPD was at all relevant times a special district organized under the laws of the State of California.   RHFPD operates a fire department that, at all relevant times, was the employer of COLLYER and DOE fire fighter defendants.

18.     At all times mentioned herein, the defendants, DOES 1 through 20, inclusive, and each

of them, were the supervisors and/or fellow servants of the named defendants, and/or policy-making officials of HERCULES or RHFPD who are legally responsible in some manner for the events and happenings referred to here, and proximately and legally caused injury and damage to PLAINTIFF as alleged here. The true names and capacities, whether individual or otherwise of Defendants DOES 1 through 20 inclusive, are unknown to PLAINTIFF, who therefore sues Defendants by such fictitious names; and leave of court will be requested to amend this complaint to show their true names and capacities when the same have become ascertained.

19.    On September 25, 2024, PLAINTIFF filed a claim for damages with HERCULES in compliance with the California Government Code § 900 *et seq*.   That claim was submitted within the time periods prescribed by California Government Code §§ 911.2 and 945.6.   HERCULES has not responded to PLAINTIFF's claim.  The claim therefore is deemed denied pursuant to California Government Code § 912.4(c).

20.    On September 25, 2024, PLAINTIFF filed a claim for damages with RHFPD in compliance with the California Government Code § 900 et seq.   That claim was submitted within the time periods prescribed by California Government Code §§ 911.2 and 945.6.   RHFPD served notice of rejection of PLAINTIFF'S claim on November 14, 2024.  This action is being filed within the time limits set forth in California Government Code § 945.6(a)(1).

**B.  MATERIAL FACTS**

21.    The California Commission on Police Officer Standards and Training (POST) expects police officers in the state to recognize that citizens they encounter may be suffering the effects of a brain seizure, and act accordingly.  POST publishes workbooks that outline the curriculum for the basic training that every police officer receives before he or she can work in the State.  Since at least 2017, POST Learning Domain volume 34, Aver. 6.1, at page 5-12, contains a section on seizures which states in part:

> A seizure is the result of a surge of energy through the brain. Instead of discharging electrical energy in a controlled manner, the brain cells continue firing, causing massive involuntary contractions of muscles and possible unconsciousness.  If only part of the brain is affected, it may cloud awareness, block normal communication, and produce a variety of undirected, unorganized movements.

22.    The same section states that the "indicators" of a seizure may include disorientation,

slurred speech, staggering or an impaired gait, purposeless sounds and body movements, lack of

response, eyes rolling upward, and a partial or complete loss of consciousness.

23.    Medical authorities have long known that attempting to physically control a seizure

victim is precisely the wrong thing to do.  For example, the Johns Hopkins School of Medicine

maintains a web site on seizures that explains:

> After a seizure, the person may remain unconscious for several minutes as the brain
> recovers from the seizure activity. He or she may appear to be sleeping or snoring.
> Gradually the person regains awareness and may feel confused, exhausted, physically
> sore, sad or embarrassed for a few hours. The person may not remember having a
> seizure, and may have other memory loss. *Occasionally, people may have abnormal or
> combative behavior after a tonic-clonic seizure while the brain is recovering.*

(emphasis added).

24.    In accord with this guidance from medical authorities, the POST workbook commands

officers who encounter seizure victims: "**Do not restrain them."**

25.    Similarly, the POST workbook warns officers that "**agitated behavior during an

episode should not be perceived as deliberate hostility or resistance to the officer.**"

26.    Similarly, paramedics employed in the State of California learn from textbooks which

advise that when treating seizure victims, "Never attempt to restrain the patient," and "Provide a quiet,

reassuring atmosphere."  Bledsoe & Cherry, Bledsoe's Paramedic Care Principles & Practice, 6th Ed.,

Vol. 2, p. 1236.

27.    The Hercules Police Department's policies and procedures contain multiple provisions

relevant to the conduct of both the defendant officers and paramedics:

**LAW ENFORCEMENT CODE OF ETHICS**

As a law enforcement officer, **my fundamental duty is** to serve the community; to
safeguard lives and property; **to protect** the innocent against deception, **the weak
against oppression or intimidation and the peaceful against violence or disorder;
and to respect the constitutional rights of all to liberty, equality and justice.**

****

**467.5   PERSONS REFUSING EMS CARE**

**If a person who is not in custody refuses EMS care or refuses to be transported** to a
medical facility, **an officer shall not force that person to receive care or be
transported.** However, **members may assist EMS personnel when EMS personnel
determine the person lacks mental capacity to understand the consequences of**

6

**refusing medical care or to make an informed decision and the lack of immediate medical attention may result in serious bodily injury or the death of the person.**

\*\*\*\*

If an officer believes that a person who is in custody requires EMS care and the person refuses, he/she should encourage the person to receive medical treatment. The officer may also consider contacting a family member to help persuade the person to agree to treatment or who may be able to authorize treatment for the person.

If the person who is in custody still refuses, the officer will require the person to be transported to the nearest medical facility. **In such cases, the officer should consult with a supervisor prior to the transport.**

(emphasis added).

## THE SUBJECT INCIDENT

28.     On April 1, 2024, PLAINTIFF, a tradesman in Local 38 of the Plumbers, Steamfitters & HVAC/Refrigeration union, was driving home on Refugio Valley Road in Hercules, CA after a visit to his grandmother, when he suffered his first (but unfortunately not last) tonic-clonic (aka *grand mal*) seizure. At least two witnesses saw PLAINTIFF's car slow to a virtual stop while PLAINTIFF's head was tilted backward and his body was convulsing.

29.     The witnesses watched as PLAINTIFF's vehicle slowly rolled down a small embankment about fifteen or twenty feet, until it was stopped by small trees and mud.  The vehicle's air bags did not deploy, and PLAINTIFF suffered few or no injuries.  His car suffered little to no damage.

30.     One of the witnesses ran down the embankment to help PLAINTIFF and observed him continuing to convulse, entirely unresponsive. That witness entered the back seat of PLAINTIFF'S car and reached forward to turn off the car and remove the keys, which he gave to defendant GOLDSTEIN minutes later.

31.     The other witness called 911 and expressly told the 911 operator  that PLAINTIFF was convulsing and apparently unresponsive as his vehicle left the road, and that he appeared to be having a seizure.   The fact that PLAINTIFF was suffering a seizure was conveyed to the individual defendants both through dispatch communications and the CAD system.

32.     At 1:07:20 pm, defendant GARCIA  entered the back seat of PLAINTIFF's vehicle, leaned forward and attempted to communicate with PLAINTIFF, with no success.  PLAINTIFF was exhibiting and continued to exhibit symptoms of the postictal phase of a seizure.  Initially he appeared

to be asleep.  Eventually he recovered minimal consciousness, but did not appear to understand what had happened, or even where he was.

33.    GARCIA performed what appeared to be a sternum rub on PLAINTIFF's chest for close to a minute - conduct that was unnecessary, inappropriate and could have been dangerous if PLAINTIFF had suffered a chest injury. GARCIA reported to dispatch that PLAINTIFF was, in his view, "10-45B," code for suffering a serious medical condition, but GARCIA recognized that PLAINTIFF was breathing and showed no signs of being in imminent danger of death or serious injury.

34.    One minute after GARCIA, defendant GOLDSTEIN arrived and approached the driver side door.  He advised GARCIA , "don't move him …. He's having a seizure," and that GARCIA should "just let him be."  GOLDSTEIN repeated, "if he's fine, just let him be," to which GARCIA responded, "OK."

35.    GOLDSTEIN then walked back to the roadway, where he encountered the two witnesses.  The first witness physically demonstrated to GOLDSTEIN how, as his vehicle left the road, PLAINTIFF's head was swung backwards and he was "convulsing."  Both she and the other witness provided their identifications to GOLDSTEIN, who photographed them and directed both witnesses to leave, stating, "We'll call you if we need a statement later."   Neither witness was contacted to provide statements prior to the defendants' submitting a criminal report to the Contra Costa District Attorney.

36.    At 1:09 pm, as GARCIA aimed his flashlight at PLAINTIFF's head, the BWC video showed sweat - another telltale sign of a seizure - glistening on PLAINTIFF's neck.  Later, the officers discussed how "slick" PLAINTIFF was.

37.    At 1:09:50 pm, defendant  COLLYER, a firefighter and paramedic with the RHFPD, arrived at the scene and stood outside the open driver's door of PLAINTIFF'S vehicle.  GARCIA told COLLYER that PLAINTIFF looked "like he was having a seizure."  GARCIA also  told COLLYER he saw no drugs and smelled no alcohol on PLAINTIFF's breath.  Soon after, PLAINTIFF appeared to regain partial consciousness, but was plainly confused about where he was and what had occurred. Ignoring PLAINTIFF's incapacity, COLLYER asked PLAINTIFF if he had any medical issues, seizures, or diabetes, or if he ingested any drugs or alcohol; PLAINTIFF said no to each question.

8

38.     From that point forward both GARCIA and COLLYER repeatedly directed PLAINTIFF to leave the car and walk up the hill, although neither of them voiced any belief that was immediately necessary, or explained why PLAINTIFF could not be evaluated where he sat.

39.     By 1:11:40, GARCIA's voice betrayed his callous annoyance. He repeated "Get. Out. Of. The. Car.," punching each word out to convey his impatience, but PLAINTIFF plainly could not understand what was happening and thought he could drive away.  GARCIA repeatedly shoved and shook PLAINTIFF, and when PLAINTIFF drowsily asked "why are you touching me," GARCIA responded: "Because you are being told to do something and you need to do it."

40.     PLAINTIFF began losing consciousness again, but GARCIA violently jostled him and refused to "leave him be," as Officer Goldstein suggested just three minutes before.  GARCIA told PLAINTIFF he needed to leave or he would "**yank**" him out.  PLAINTIFF's head kept falling to his shoulder, because the seizure had left him exhausted.

41.     Shortly after 1:12 pm, GARCIA, a mere five minutes after his arrival, lost his patience and began to shove PLAINTIFF out of his car.  By that time, GOLDSTEIN had returned and, despite what he said four minutes earlier, joined GARCIA in attempting to forcibly extract PLAINTIFF from the car.  They were joined by defendant THOMPSON.  Neither paramedic COLLYER nor any other medically trained responder had indicated to the officers that extracting PLAINTIFF from the car was necessary to avoid serious bodily injury or death.  However, when GOLDSTEIN asked COLLYER if he wanted the officers to force PLAINTIFF from the car, COLLYER inexplicably and improperly responded affirmatively.

42.     As the officers began to forcefully extract him from his car, PLAINTIFF repeatedly asked, "What are you doing?"  The officers did not relent.  GARCIA grabbed PLAINTIFF by the neck, angrily screamed "get out of the car," and cursed at PLAINTIFF repeatedly.  In an even more shocking display of unprofessional conduct, THOMPSON, who had been there at most two minutes, angrily barked, "**Do not fucking fight us.  You will fucking get ripped out of this car.  We're not playing. Get the fuck up.**"

43.     After THOMPSON's expletive-ridden outburst failed to have any effect, GARCIA drive stunned PLAINTIFF with his Taser, sending a high current through the body of a young man who had

9

1  just suffered a medical condition caused by abnormal electrical activity in the brain.  GARCIA then

2  screamed, "GET OUT OF THE CAR."

3      44.    PLAINTIFF was violently removed from his car, with GOLDSTEIN pulling on his

4  limbs and THOMPSON pulling him by his hair.  PLAINTIFF continued to struggle and attempt to free

5  himself, as seizure victims are known to do, and as Cal. POST Learning Domain 34 warns.  In

6  response, GARCIA, in violation of HPD Policy 309.5.4, used his Taser *twice* more, sending additional

7  pulses of current through PLAINTIFF's body.  PLAINTIFF howled in pain.

8      45.    In BWC videos recorded after PLAINTIFF was strapped to a gurney, THOMPSON

9  admitted that during the struggle he punched PLAINTIFF in the face twice.  THOMPSON claimed it

10  was because PLAINTIFF kicked him, but no such kick is evident in the BWC videos.

11      46.    Later, GARCIA admitted that PLAINTIFF was not combative until the officers began

12  grabbing him, stating, "He wasn't combative at first but as soon as … 'hey dude we're getting you out of

13  the car' and Goldstein grabbed him he immediately started throwing hands."

14      47.    During the entire physical struggle, defendant COLLYER said absolutely nothing.

15      48.    In the aftermath of the physical battle, the defendant officers were advised that

16  PLAINTIFF was the son of a fellow law enforcement officer, and from that point they embarked on a

17  transparent effort to create the false impression that they suspected plaintiff of being high on drugs.

18      49.    GARCIA searched PLAINTIFF's car and found no evidence that PLAINTIFF possessed

19  or used intoxicating or other illegal substances; he admitted to THOMPSON, "Dude there's nothing.

20  There's no pipes, there's no little baggies."  Still, THOMPSON proclaimed "he's high on something,"

21  and GARCIA obtrusively stated that he agreed, "He's high as fuck on something, I just don't know

22  what it is." Garcia then silenced the audio on his BWC for the final twelve minutes of the recording

23  without explaining why in his narrative report, in plain violation of Hercules PD Audio/Video

24  Recorder ("AVR") policy, section 448.5.

25      50.    THOMPSON violated the AVR policy from the start of the service call: he did not

26  activate his BWC at all.  He claimed in his narrative report that his BWC "was not activated due to the

27  fast evolving events," which was utter nonsense: there was nothing "fast evolving" about the call until

28  the officers chose to force PLAINTIFF out of his vehicle.  GOLDSTEIN, who was with THOMPSON

FIRST AMENDED COMPLAINT; JURY DEMAND          Case No.: 25-cv-01297-YGR

when the call came in, had no trouble activating his BWC.

51.    Approximately 20 minutes after the incident, GARCIA continued his effort to justify his conduct by taking a picture of PLAINTIFF's eye while shining a flashlight on his face, and comparing the size of PLAINTIFF'S pupil *in the photo on his cell phone to* a pocket guide published by the CHP. That was not a proper procedure for evaluating pupil size for law enforcement purposes.

52.    By the time he was dragged to a gurney on the roadway shoulder, PLAINTIFF had a lacerated lip, and a large portion of his white shirt was stained blood red.

53.    PLAINTIFF was evaluated and released from the Contra Costa Regional Medical Center in Martinez, having been diagnosed as having suffered a seizure.

54.    Subsequently, PLAINTIFF was evaluated by Kaiser specialists, who conducted an EEG that revealed abnormal signals consistent with an increased risk of seizures.  PLAINTIFF was diagnosed with epilepsy, and has been taking anti-seizure medications since shortly after the incident. Since April 1, 2024 PLAINTIFF has suffered several additional seizures.

55.    Test of PLAINTIFF'S blood and urine collected shortly after the incident revealed no alcohol or drugs in his system other than trace amounts of THC, and a sedative administered to him in the ambulance *after* the incident with defendants.

**FIRST CAUSE OF ACTION UNDER 42 U.S.C. § 1983
FOR UNLAWFUL ARREST IN VIOLATION OF THE FOURTH
AND FOURTEENTH AMENDMENTS AGAINST AGAINST DEFENDANTS GARCIA,
THOMPSON AND GOLDSTEIN**

56.    PLAINTIFF realleges each and every paragraph as if fully set forth herein.

57.    Defendants  GARCIA, THOMPSON AND GOLDSTEIN, acting under the color of state law in their individual and personal capacities, deprived PLAINTIFF of the rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, to not be deprived of liberty without due process of law, by subjecting him, or through their deliberate indifference allowing others to subject him, to improper arrest without probable cause.  Defendants GARCIA, THOMPSON AND GOLDSTEIN had no factual basis for believing that PLAINTIFF had committed a crime or was an immediate threat to his own safety when they encountered him sitting peacefully in the front seat of his car.  The mere fact that a person is in a single vehicle accident does

11

not constitute probable cause for believing he was driving while impaired by a intoxicating substance, or that he had committed any other crime.  This is so particularly in light of the fact that witnesses told dispatchers that PLAINTIFF appeared to be suffering from a seizure, and that information was successfully conveyed to GARCIA, THOMPSON AND GOLDSTEIN before they encountered PLAINTIFF.

58.    As a result of these defendants' deliberate indifference to PLAINTIFF's constitutional rights, PLAINTIFF was deprived of those rights, and suffered physical injuries, emotional pain and suffering, anxiety, confusion, disorientation, and other damages in an amount not yet ascertained but to be proven.

59.    Defendants GARCIA, THOMPSON AND GOLDSTEIN subjected PLAINTIFF to their wrongful conduct knowingly, maliciously, and with conscious and reckless disregard for the rights and safety of PLAINTIFF.   The conduct of the aforementioned defendants entitles PLAINTIFF to punitive damages and penalties allowable under 42 USC § 1983.

**SECOND CAUSE OF ACTION UNDER 42 U.S.C. § 1983 FOR UNREASONABLE USE OF FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AGAINST DEFENDANTS GARCIA, THOMPSON AND GOLDSTEIN**

60.    PLAINTIFF realleges each and every paragraph as if fully set forth herein.

61.    Defendants  GARCIA, THOMPSON AND GOLDSTEIN, acting under the color of state law in their individual and personal capacities, deprived PLAINTIFF of the rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, by subjecting him, or through their deliberate indifference allowing others to subject him, to unreasonable, excessive force in detaining PLAINTIFF.  Under the circumstances presented, no use of force at all was warranted or reasonable.

62.    As a result of the aforementioned defendants' unlawful conduct PLAINTIFF suffered personal injuries, economic losses, great humiliation, embarrassment, and mental suffering, all to PLAINTIFF's damage.

63.    PLAINTIFF is entitled to seek damages suffered as a result of the above-described conduct pursuant to 28 U.S.C. §§ 1983 and 1988.

64.    Defendants GARCIA, THOMPSON AND GOLDSTEIN subjected PLAINTIFF to their

1    wrongful conduct knowingly, maliciously, and with conscious and reckless disregard for the rights and

2    safety of PLAINTIFF.   Their conduct entitles PLAINTIFF to punitive damages and penalties

3    allowable under 42 USC § 1983.

4                **THIRD CAUSE OF ACTION FOR VIOLATION OF THE TITLE II**
     **OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12131 et. sec.)**
5                     **AGAINST DEFENDANTS HERCULES AND RHFPD**

6        65.    PLAINTIFF realleges each and every paragraph as if fully set forth herein.

7        66.    Thirty five years ago, when the United States Congress passed the Americans with

8    Disabilities Act (42 U.S.C. § 12131 et. seq.) (ADA), one of its express purposes was to prevent

9    inappropriate arrests and mistreatment of seizure victims. See *Jackson v. Inhabitants of Town of*

10   *Sanford*, 1994 U.S. Dist. LEXIS 15367 at 24 n. 12 (D. Me. 1994) (quoting 1990 U.S.C.C.A.N. 473).

11   Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such

12   disability, be excluded from participation in or be denied the benefits of the services, programs, or

13   activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

14       67.    Discrimination under the ADA includes not only a denial of benefits and services, but

15   also a failure to provide a reasonable accommodation for an individual's disability.

16       68.    On April 1, 2024, PLAINTIFF was a "qualified individual"under the ADA with regard

17   to the receipt of police and other emergency services.

18       69.    At all relevant times on April 1, 2024, PLAINTIFF was disabled within the meaning of

19   the ADA.  The automobile incident that resulted in a witness call for emergency services occurred

20   while PLAINTIFF was suffering from a *grand-mal* seizure, during which his neurological function was

21   so severely impaired that he was unconscious, unable to communicate or understand communications

22   from others, and unable to control the movements of his body.  When he was first encountered by

23   defendant GARCIA, PLAINTIFF was in the postictal phase of the seizure, during which the victim

24   remains unable to understand and act upon oral commands, and sometimes perceives efforts to restrain

25   him as a threat.  In such cases, the victim may respond instinctively to restraint by seeking to escape

26   and flee.  PLAINTIFF remained in this condition from the time GARCIA encountered him to the time

27   that all three individual defendants violently removed him from his car.  None of PLAINTIFF's

28   conduct up to and through the time of his physical detention was the product of conscious thought.

                                                    13

70.    Shortly after April 1, 2024, PLAINTIFF was found through EEG testing to have an organic brain disorder that rendered him susceptible to seizures, and his doctors have formally diagnosed him with a seizure disorder.  He has been taking anti-seizure medications, but continues to suffer episodic grand-mal seizures as his doctors attempt to find the correct dosage to control his condition.  Because his seizure disorder remains insufficiently controlled by medications, PLAINTIFF is not qualified to drive and cannot safely work in his chosen profession.  All of these disabling conditions were present on April 1, 2024.

71.    Defendants HERCULES and RHFPD are public entities as defined under the ADA.

72.    The ADA applies to arrests, detentions, and other activities of police officers in their dealings with the general public, as well as to the actions of medical first responders including paramedics.

73.    Under the ADA defendant HERCULES  is vicariously liable for the misconduct of its employees and agents, including defendants GARCIA, THOMPSON and GOLDSTEIN, and defendant RHFPD  is vicariously liable for the misconduct of its employees and agents, including defendant COLLYER.

74.    When defendants GARCIA, THOMPSON, GOLDSTEIN and COLLYER encountered PLAINTIFF on April 1, 2024, they actually knew, and certainly had reason to know that PLAINTIFF was disabled by a brain seizure.  They were informed by dispatchers that an eyewitness reported seeing PLAINTIFF suffering from a seizure.  GOLDSTEIN told GARCIA that PLAINTIFF was suffering from a seizure, and GARCIA expressed his agreement with that appraisal.  When COLLYER arrived on scene, GARCIA told him PLAINTIFF was suffering for a seizure.  GARCIA searched PLAINTIFF's car moments after his arrival and saw no evidence to suggest PLAINTIFF was suffering from anything other than the seizure reported by witnesses.  GARCIA found no evidence of drug use and detected no order of alcohol while sitting in the car with PLAINTIFF, and he so informed the other defendants.

75.    Defendants HERCULES and RHFPD, through their employees and agents, defendants GARCIA, THOMPSON, GOLDSTEIN, and COLLYER, wrongfully arrested, seized, authorized and/or used excessive force against, and injured PLAINTIFF, because those employees misperceived

14

the non-criminal effects of PLAINTIFF's disability as evidence of impaired driving and criminal interference with the performance of their duties.

76.    In addition, even if defendants GARCIA, THOMPSON and GOLDSTEIN had probable cause to detain or arrest plaintiff for a crime that they thought might be unrelated to his disability, they and COLLYER violated the ADA by failing to reasonably accommodate PLAINTIFF's known disability, causing him to suffer physical and emotional injuries he need not have suffered. PLAINTIFF's need for accommodation was obvious and apparent, based on the totality of the circumstances, defendants GARCIA, THOMPSON, GOLDSTEIN and COLLYER's actual knowledge, and defendants training on generally accepted law enforcement and paramedics' standards for safely handling encounters with seizure victims.  The reasonable accommodations that defendants GARCIA, THOMPSON, GOLDSTEIN and COLLYER were required to provide, and failed to provide, included following California POST training and generally accepted standards for safely handling seizure victims by refraining from making unnecessary physical contact with PLAINTIFF, making no effort to restrain him, and providing him with sufficient time to recover from the seizure and understand what had occurred, and what he needed to do.

77.    The aforementioned individual defendants knew that giving PLAINTIFF time to recover from the seizure was an available accommodation, as evidenced by the fact that GOLDSTEIN told GARCIA that they should just "leave him be," and GARCIA agreed.  Body worn camera videos show that all of the individual defendants loitered at the scene of the incident for at least 20 minutes after they extracted him from his vehicle, demonstrating that they had no pressing need to attend to other matters.  PLAINTIFF has suffered multiple seizures since April 1, 2024 and in each instance he recovered his cognitive abilities within 15 minutes.

78.    Defendants HERCULES and RHFPD also are directly liable to PLAINTIFF for violating the ADA by discriminating against seizure victims by failing to properly train their employees on how to recognize seizure victims and/or and treat them appropriately.  Defendants GARCIA, THOMPSON, GOLDSTEIN and COLLYER knew that PLAINTIFF was suffering from a seizure but had not been provided with the training required to treat him appropriately.

79.    As a direct and proximate result of the violations of the ADA by defendants

FIRST AMENDED COMPLAINT; JURY DEMAND          Case No.: 25-cv-01297-YGR

HERCULES and RHFPD, by and through their employees and agents, PLAINTIFF sustained serious and permanent injuries and is entitled to damages, penalties, costs and attorneys' fees under 42 U.S.C. § 12205.

**FOURTH CAUSE OF ACTION UNDER CALIFORNIA CIVIL CODE § 52.1 (BANE ACT) - UNLAWFUL DETENTION AND EXCESSIVE FORCE - AGAINST DEFENDANTS HERCULES, GARCIA, THOMPSON AND GOLDSTEIN**

80.     PLAINTIFF realleges each and every paragraph as if fully set forth herein.

81.     Under California Civil Code Section 52.1, if a person interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, any individual whose exercise or enjoyment of rights has been interfered with may bring a civil action for damages.

82.     Using threats, intimidation, and coercion, including but not limited to verbal, profanity-laced threats, pushing, pulling, grabbing, punching and tasing PLAINTIFF's body, and by taking PLAINTIFF to the ground and and arresting him without probable cause, defendants GARCIA, THOMPSON AND GOLDSTEIN attempted to and did interfere with PLAINTIFF's rights and privileges to be free of unlawful detention and excessive force secured under the Fourth and Fourteenth Amendments to the United States Constitution, and the laws of the State of California and the California Constitution.  The aforementioned defendants subjected PLAINTIFF to such wrongful conduct knowingly, maliciously, and/or with conscious and reckless disregard for whether the rights and safety of PLAINTIFF would be violated by their acts and/or omissions.

83.     As a direct and proximate result of the aforementioned defendants' acts and/or omissions as set forth above, PLAINTIFF sustained injuries and damages as set forth in this complaint.

84.     The aforementioned acts were committed by defendants while in the course and scope of their employment by defendant HERCULES.  Defendant HERCULES is vicariously liable for harm caused by its employees and agents, including the aforementioned individual defendants, pursuant to California Government Code Section 815.2(a) and California common law.

85.     The conduct of the aforementioned defendants entitles PLAINTIFF to an award of

16

actual damages, punitive damages and exemplary damages up to three times actual damages, a civil penalty of $25,000, costs, and attorneys' fees pursuant to California Civil Code Sections 52 and 52.1. No punitive damages are sought against defendant HERCULES.

### FIFTH CAUSE OF ACTION UNDER CIVIL CODE SECTION 51.7  (RALPH ACT) - VIOLENT ACTS AND FALSE POLICE REPORTS - AGAINST DEFENDANTS HERCULES, GARCIA, THOMPSON AND GOLDSTEIN

86.     PLAINTIFF realleges and incorporates herein by reference the previous allegations as if fully set forth herein.

87.     Pursuant to California Civil Code Section 51.7 (the Ralph Act), all persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, "on account of" any disability or medical condition, including epilepsy and seizure disorders. The right to be free from disability-based violence or intimidation under the Ralph Act includes the right to be free from being the subject of a claim or report to a law enforcement agency that falsely alleges that the person has engaged in unlawful activity or in an activity that requires law enforcement intervention, when the person making the report knows that the claim or report is false, or makes the report with reckless disregard for the truth or falsity of the claim or report.   The Contra Costa District Attorney's office is a "law enforcement agency" under California law, including for the purposes of the Ralph Act.

88.     Defendants GARCIA, THOMPSON, and GOLDSTEIN violated the Ralph Act when, "on account of " PLAINTIFF's seizure disorder and consequent inability to understand and comply with their attempts to communicate with him, they grew angry with PLAINTIFF and subjected PLAINTIFF to a violent assault and battery.

89.     Defendants GARCIA, THOMPSON and DOES 1-20 also violated the Ralph Act when, "on account of " PLAINTIFF's seizure disorder and consequent inability to understand and comply with their attempts to communicate with him, they submitted a report to the Contra Costa County District Attorney's office which falsely, dishonestly, corruptly and maliciously accused PLAINTIFF of serious crimes of moral turpitude, in an effort to cover up their beating of a citizen who was suffering from a medical emergency.

17

90.    Pursuant to California Government Code Section 815.2, defendant HERCULES is legally liable for all damages suffered as a result of the aforesaid actions of the individual named and DOE defendants.

### SIXTH CAUSE OF ACTION FOR COMMON LAW FALSE ARREST
### (CAL. GOVT. CODE §§ 815.2, 820) AGAINST DEFENDANTS HERCULES, GARCIA, THOMPSON AND GOLDSTEIN

91.    PLAINTIFF realleges each and every paragraph as if fully set forth herein.

92.    Defendants GARCIA, THOMPSON AND GOLDSTEIN arrested PLAINTIFF without a warrant and without probable cause to suspect he had committed a crime or was otherwise subject to arrest.  Each of those defendants has been advised and knew that PLAINTIFF appeared to have suffered an epileptic seizure, and knew from their training that any behavior he might exhibit should not be mistaken for conscious resistance or other criminal behavior.

93.    As a proximate result of those defendants' intentional and wrongful conduct, PLAINTIFF suffered damages.

94.    The aforementioned acts were committed by defendants while in the course and scope of their employment by defendant HERCULES.  Defendant HERCULES is vicariously liable for the common law torts of its employees and agents, including the aforementioned individual defendants, pursuant to California Government Code Section 815.2(a) and California common law.

95.    The above-recited actions of the individual defendants were done with malice, fraud, or oppression, and in reckless disregard of the plaintiff's rights.  As a result, pursuant to California Civil Code § 3294, PLAINTIFF also is entitled to and seeks punitive damages against all individual defendants in their individual capacities.

### SEVENTH CAUSE OF ACTION FOR COMMON LAW BATTERY
### (CAL. GOVT. CODE §§ 815.2, 820) AGAINST DEFENDANTS HERCULES, GARCIA, THOMPSON AND GOLDSTEIN

96.    PLAINTIFF realleges each and every paragraph as if fully set forth herein.

97.    Defendants GARCIA, THOMPSON AND GOLDSTEIN, by committing violence against PLAINTIFF, intentionally caused offensive contact with PLAINTIFF's person.

98.    PLAINTIFF did not consent to such violent and offensive acts and contact by

18

defendants.

99.    As a proximate result of those defendants intentional and wrongful conduct, PLAINTIFF suffered damages.

100.    The aforementioned acts were committed by defendants while in the course and scope of their employment by defendant HERCULES.  Defendant HERCULES is vicariously liable for the common law torts of its employees and agents, including the aforementioned individual defendants, pursuant to California Government Code Section 815.2(a) and California common law.

101.    The above-recited actions of the individual defendants were done with malice, fraud, or oppression, and in reckless disregard of the PLAINTIFF's rights.  As a result, pursuant to California Civil Code § 3294, PLAINTIFF seeks punitive damages against all individual defendants in their individual capacities.

**EIGHTH CAUSE OF ACTION BASED ON COMMON LAW NEGLIGENCE (CAL. GOVT. CODE §§ 815.2, 820) AGAINST DEFENDANTS HERCULES, GARCIA, THOMPSON, GOLDSTEIN AND DOES 1-20.**

102.    PLAINTIFF realleges each and every paragraph as if fully set forth herein.

103.    Defendants  GARCIA, THOMPSON AND GOLDSTEIN owed PLAINTIFF the duty to act with reasonable care and skill in the execution and enforcement of their duties pursuant to California Government Code Sections 820 and 844.6(d), and California Civil Code Sections 1708 and 1714(a).

104.    The aforementioned defendants breached their duties to act with reasonable care in that:

(a)  all three defendants failed to follow their training, departmental procedures and established standards of care in the police profession by failing to allow PLAINTIFF time to recover after they were expressly told he was suffering from a seizure, and instead using force to remove him from his vehicle.  Even if they genuinely thought he was impaired impaired by substance abuse, that belief was without specific articulable facts to support it.  PLAINTIFF's involvement in a solo vehicle accident did not create a reasonable suspicion of criminal conduct when an eyewitness had provided a credible (and ultimately correct) medical explanation for PLAINTIFF's disability.

(b)  all three defendants negligently failed to follow departmental procedures that required a

determination by EMS personnel that PLAINTIFF needed to be removed from the car to prevent
"serious bodily injury" or "death," before he could be forcibly moved without his consent.

(c)  all three defendants negligently failed to follow their own departmental procedures in failing
to consult with a supervising officer prior to attempting to move a person to avoid death or serious
injury.

(d)  defendants GARCIA and THOMPSON were negligent in failing, before submitting their
incident reports, to obtain information from the two witnesses who expressly told GOLDSTEIN that
they saw PLAINTIFF displaying seizure symptoms at the time his vehicle left the road.

(e)  defendant GOLDSTEIN was negligent in failing to follow his own advice and in violating
departmental procedure (No. 300.2.1) as well as state and federal law in failing to intercede when he
saw two other officers violate PLAINTIFF'S legal and constitutional rights and their own training, by
using force on a young man who was recovering from a brain seizure.  GOLDSTEIN knew
PLAINTIFF was reported to be having a seizure, heard and saw a witness describe that PLAINTIFF
convulsing in a posture that resembled that of a seizure victim, and knew that the proper response was
to, as he told GARCIA, "leave him be," yet GOLDSTEIN did nothing to stop GARCIA and
THOMPSON from battering a man suffering a medical crisis, and instead assisted them.
GOLDSTEIN's conduct was incomprehensible.

(f)  Defendants DOES 1-20 negligently and incompetently chose to submit a criminal report to
the Contra Costa County District Attorney, charging PLAINTIFF with the crime of driving under the
influence of any drug, Vehicle Code § 23152(f), even after receiving blood test results that showed
plaintiff was not driving under the influence.  The test results showed trace amounts of marijuana that
could not have impaired plaintiff's ability to drive, and the presence of a sedative - benzodiazepine -
that the DOE defendants apparently believed was in PLAINTIFF'S bloodstream at the time of the
incident.  However, they negligently failed to review plaintiff's ambulance or hospital records, both of
which noted that EMTs gave plaintiff Versed  (a type of benzodiazepine) *after* the incident with the
officers.  The DOE defendants also ignored multiple communications from PLAINTIFF'S family
informing them that PLAINTIFF had suffered additional seizures and had been diagnosed with
epilepsy based on objective testing of his brain function, lending strong support for the conclusion that

FIRST AMENDED COMPLAINT; JURY DEMAND                Case No.: 25-cv-01297-YGR

PLAINTIFF was disabled by a seizure during the April 1 incident.  Specifically, on April 15, 2024 and May 8, 2024, the DOE defendants were informed of PLAINTIFF's repeated seizures and diagnosis and provided with supporting records, yet still chose to seek prosecution of PLAINTIFF by submitting their reports to the District Attorney on July 15, 2024.  Although the District Attorney officially determined that the case lacked merit within two weeks, by July 29, and so informed the named and DOE defendants, none of them chose to inform PLAINTIFF or his family of the fact that he would not be prosecuted, and PLAINTIFF did not learn that his name had been cleared until November 2024.

105.    As a direct and proximate result of the aforementioned negligence, PLAINTIFF sustained serious and permanent injuries and damages, and is entitled to relief from each and every defendant.

106.    The aforementioned acts were committed by defendants while in the course and scope of their employment by defendant HERCULES.  Defendant HERCULES is vicariously liable for the common law torts of its employees and agents, including the aforementioned individual defendants, pursuant to California Government Code Section 815.2(a) and California common law.

107.    The above-recited actions of the individual defendants were done with malice, fraud, or oppression, and in reckless disregard of PLAINTIFF's rights.  As a result, pursuant to California Civil Code § 3294, PLAINTIFF also is entitled to and seeks punitive damages against all individual defendants in their individual capacities.

**NINTH CAUSE OF ACTION FOR COMMON
LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(CAL. GOVT. CODE §§ 815.2, 820) AGAINST DEFENDANTS HERCULES, GARCIA,
THOMPSON, GOLDSTEIN AND DOES 1-20**

108.    PLAINTIFF realleges and incorporates herein by reference the previous allegations as if fully set forth herein.

109.    The following actions of defendants GARCIA, THOMPSON, GOLDSTEIN, HERCULES AND DOES 1-20, were intentional, extreme, outrageous and despicable:

a)  arresting or supporting the arrest of PLAINTIFF when they knew PLAINTIFF was incapable of committing a crime and was in medical distress;

b)  writing narrative reports that accused PLAINTIFF of  committing violent acts they knew

21

PLAINTIFF did not commit; and

c) recommending to the District Attorney that PLAINTIFF be charged with crimes they knew PLAINTIFF did not commit.

110.    Defendants abused their positions of authority as members of a public law enforcement agency, which provided them power to affect PLAINTIFFS' interests and well-being.

111.    The above mentioned defendants knew that PLAINTIFF, having just suffered from a serious medical event, was particularly vulnerable to emotional distress, and that their aforementioned conduct would likely result in PLAINTIFF suffering severe mental and emotional distress. Their actions in arresting and accusing plaintiff of crimes, even after it was demonstrated that he suffered from a seizure disorder, were done with the intent to cause him serious emotional distress, or with reckless disregard of the probability of causing him serious emotional distress.

112.    As a direct, legal and proximate result of the actions of the aforementioned named and DOE defendants, PLAINTIFF suffered severe emotional distress, all to his damage in a sum to be shown according to proof and within the jurisdiction of the Superior Court.

113.    The aforesaid were carried out with a conscious disregard of PLAINTIFF's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code Section 3294, entitling PLAINTIFF to punitive damages in an amount appropriate to punish and set an example of the individual named and DOE defendants.

114.    Pursuant to California Government Code Section 815.2, defendant HERCULES is legally liable for all compensatory damages suffered as a result of the aforesaid tortious actions of the individual named and DOE defendants.

**TENTH CAUSE OF ACTION FOR COMMON LAW**
**DEFAMATION (CIVIL CODE § 43;  GOVT. CODE §§ 815.2, 820)**
**AGAINST DEFENDANTS GARCIA, THOMPSON, COLLYER, HERCULES, RHFPD AND**
**DOES 1-20**

115.    PLAINTIFF realleges and incorporates herein by reference the previous allegations as if fully set forth herein.

116.    Pursuant to California Civil Code Section 43, PLAINTIFF had the "right of protection from ... personal insult, from defamation, and from injury to his personal relations."

117.     Defendants GARCIA and THOMPSON violated PLAINTIFFS' aforementioned rights by intentionally and knowingly publishing, to other Hercules PD officers and supervisors and the Contra Costa County District Attorney's office, false information dishonestly, corruptly and maliciously accusing PLAINTIFF of serious crimes of moral turpitude, claiming or insinuating that PLAINTIFF was driving while high on drugs and consciously interfered with the work of police officers.  This was done in an effort to cover up their misconduct, discredit PLAINTIFF, intimidate him, impair his ability to make claims against them for their violations of his rights, and discourage him from even attempting to make such claims.  Said defendants also intentionally and knowingly insinuated that PLAINTIFF engaged in criminal conduct by their selective omission of pertinent facts.

118.     Defendants GARCIA and THOMPSON made numerous false and defamatory claims and misleading omissions in their narrative reports.  Specifically, GARCIA falsely claimed or falsely insinuated:

(a)  That PLAINTIFF violated Section 69(a) of the Penal Code, which prohibits a person from using violence to interfere with a police officer's performance of his or her duties.  The only action that GARCIA and the other officers on scene took on that day that PLAINTIFF interfered with was the officers' forceful removal of him from his car, but neither GARCIA nor any other officer did our could articulate why they had a legal duty to remove PLAINTIFF from his vehicle.

(b)  That PLAINTIFF violated Section 23152(f) of the Vehicle Code.  As noted, there was no evidence in PLAINTIFF's car of drug use, and there was affirmative evidence that PLAINTIFF was instead incapacitated by a medical condition.

(c)  That he saw PLAINTIFF "make his right hand into a fist" seconds before defendant THOMPSON punched PLAINTIFF in the face.  GARCIA made no such claim while discussing the incident with other officers at the scene, and if PLAINTIFF balled his hand into a fist, it was not a violent act but rather a natural response to being pulled, pushed, grabbed and tased by the three officers.

(d)  That PLAINTIFF "ignored all Officers' commands," falsely implying that PLAINTIFF had the capacity to understand those commands, which he did not.  Indeed, GARCIA himself reported that PLAINTIFF seemed to have "no clue as to what was happening."

(e)  That he (GARCIA) had the experience and training to identify persons impaired by psychoactive drugs, in order to buttress his claim that PLAINTIFF was so impaired.  There is one certification recognized in the State of California for police officer expertise in recognizing when a person is impaired by drugs: the International Drug Evaluation and Classification (DEC) Program operated by the International Association of Chiefs of Police (IACP).  Police officers who successfully complete the program are certified as a drug recognition expert or evaluator (DRE).  GARCIA was not and is not a DRE, and did not perform a competent evaluation of PLAINTIFF at the accident scene or after.

119.    GARCIA's report also contained omissions designed to mislead readers, including:

(a)  Failing to mention that Officer Goldstein arrived on scene and that they initially agreed that because PLAINTIFF was reported to have suffered a seizure, they should leave him alone and not attempt to move him;

(b)  Failing to mention that PLAINTIFF did not exhibit any aggressive behavior until he (Garcia) and other officers and firefighters began shoving and grabbing him;

(c)  Failing to mention that PLAINTIFF denied the use of drugs repeatedly, both while they were in PLAINTIFF's car during the postictal phase of the seizure, and hours later, after he recovered and was sitting in the hospital;

(d)  Noting that PLAINTIFF tried to fasten his seat belt and close his door, insinuating that there was a danger he would move his vehicle and injure himself or others, without noting that the vehicle was not running and the keys were in the custody of defendant GOLDSTEIN.

(e)  Insinuating that PLAINTIFF made a fist with the intention of striking one of the officers, without mentioning that PLAINTIFF was entirely docile before officers began grabbing and striking him;

(f)  Failing to mention in his report that blood and urine tests contradicted his claims that PLAINTIFF was driving under the influence,

(g)  Claiming that in his experience PLAINTIFF'S behavior suggested he had taken "psychoactive drugs," without mentioning that PLAINTIFF'S was at least equally consistent with a medical condition, and

(h)  Most importantly, failing to mention that at the time they used force to remove PLAINTIFF from his car, the officers had no articulable basis for detaining or arresting PLAINTIFF, including no basis for believing that he had to be removed from his car promptly for his own safety.

120.    Defendant THOMPSON falsely claimed:

(a)  That the response was to a report of a "solo vehicle collision."  As noted, the response was to a report of a driver in medical distress.

(b)  That he observed "object [sic] signs" of intoxication in PLAINTIFF's behavior, including confusion, falling in an out of consciousness, and being involved in a traffic accident.  Like GARCIA, Thompson did not indicate he has DRE certification, and the things he observed are *not* objective signs of intoxication such as the odor of alcohol, lack of physical coordination and slurred speech; they are objective signs of a host of medical conditions and impairments, including seizures.

(c)  That firefighters requested assistance because "they feared Bruce may attack them."  That was a baseless fabrication.  The BWC recordings make clear that PLAINTIFF exhibited no desire to "attack" anyone; when the officers were not pushing and shoving him, he repeatedly fell asleep.  The many firefighters at the scene neither expressed nor displayed any indication that they feared PLAINTIFF would attack them, and did not request police assistance for that reason or *any* reason. Instead, GOLDSTEIN offered to remove PLAINTIFF from the car and the rookie paramedic in charge, who had been in uniform for about one year, simply consented to that proposal.

121.    Upon information and belief, DOES 1-20 also committed defamation by republishing the officers' falsehood-laden narrative reports to the Contra Costa County District Attorney's office, with knowledge or reckless disregard for the fact that PLAINTIFF had no illegal substances in his body, had suffered a seizure, and lacked the mental capacity to commit any crimes.

122.    GARCIA'S AND THOMPSON'S false accusations were retransmitted to state and federal databases.

123.    In order to cover up his misconduct, COLLYER prepared and submitted to supervisors and others at the RHFPD a Patient Care Report that falsely claimed PLAINTIFF was "combative" upon his unit's arrival, and falsely quoted PLAINTIFF as stating "Get away or I will fuck you up," when COLLYER approached.  PLAINTIFF said no such thing; defendant GARCIA's BWC video shows that

25

when COLLYER approached, PLAINTIFF was **sleeping**.

124.    All of the aforesaid individual DEFENDANTS' false and misleading publications were *per se* defamatory, and the named and DOE defendants made or caused to be made the aforementioned false and defamatory reports knowing that the reports were false, or with reckless disregard for the truth or falsity of the reports, and thus those defamatory reports were not privileged communications, pursuant to Civil Code Section 47(b)(5).

125.    As a direct and proximate result of GARCIA, THOMPSON, COLLYER, AND DOES 1-20's wrongful conduct, PLAINTIFF has suffered damages including but not limited to economic losses, loss of reputation, emotional distress, humiliation, shame, and other damages.

126.    In doing the things alleged herein, GARCIA, THOMPSON and COLLYER's conduct was despicable.  Those defendants acted toward PLAINTIFF with malice, oppression, fraud, and with willful and conscious disregard for PLAINTIFF'S rights, entitling PLAINTIFF to recover punitive damages from those individual defendants.

127.    Pursuant to California Government Code Section 815.2, defendants HERCULES and RHFPD are legally liable for all compensatory damages suffered as a result of the aforesaid tortious actions of their employees and DOE defendants.

### ELEVENTH CAUSE OF ACTION FOR GROSS NEGLIGENCE
### (HEALTH & SAFETY CODE § 1799.106; GOVT. CODE §§ 815.2, 820)
### AGAINST DEFENDANTS COLLYER, RHFPD AND DOES 1-20

128.    PLAINTIFF realleges and incorporates herein by reference the previous allegations as if fully set forth herein.

129.    Pursuant to Penal Code Section 409.3 and Health and Safety Code Section 1798.6, authority for the management of PLAINTIFF'S care at the scene of his automobile collision was vested in defendant COLLYER.

130.    Consequently, and as stated previously, GARCIA, THOMPSON and GOLDSTEIN had no authority to force plaintiff to receive care or be transported unless advised by COLLYER that "the person lacks mental capacity to understand the consequences of refusing medical care or to make an informed decision ***and the lack of immediate medical attention may result in serious bodily injury or the death of the person***."  (emphasis added). In other words, GARCIA, THOMPSON and

26

GOLDSTEIN had no right to force PLAINTIFF from his vehicle unless COLLYER found that: (1) PLAINTIFF lacked mental capacity to make medical decisions for himself, and (2) failure to move PLAINTIFF immediately could result in serious bodily injury or death.

131.    Although there was a basis to conclude that PLAINTIFF temporarily lacked mental capacity, there was **no** basis whatsoever for concluding that his life or health required that he be immediately extracted from his car.  To the contrary, COLLYER knew or or had ample reason to know that PLAINTIFF was recovering from a grand mal or tonic-clonic seizure, and that the standard of care was to leave PLAINTIFF alone and give him an opportunity to recover his faculties.

132.    As a result of the above, COLLYER'S affirmative response when GOLDSTEIN offered to forcefully extract PLAINTIFF from his vehicle was grossly negligent.

133.     COLLYER'S failure to intervene when he witnessed the officers tasing, punching, and beating PLAINTIFF also was grossly negligent.

134.    Pursuant to California Government Code Section 815.2, defendant RHFPD is legally liable for all compensatory damages suffered as a result of the aforesaid tortious actions of the COLLYER and DOE defendants.

V.    **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for a judgment against defendants, and each of them, as follows:

(1) For general damages, including to compensate him for physical pain and suffering and emotional distress, according to proof at the time of trial;

(2) For special damages, including the cost of medical care, according to proof at the time of trial;

(3) For punitive and exemplary damages against the individual defendants as indicated above, commensurate with the acts complained of herein;

(4) For actual damages, penalties, costs, interest, and attorney fees as allowed by 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. § 12205, and federal law;

(5) For actual damages, punitive and exemplary damages against the individual defendants, civil penalties, costs and attorneys fees pursuant to California Civil Code § 52.1, and

(6) For such other and further relief and damages as the Court may deem just and proper.

DATED: April 1, 2025                    BRENT & FIOL, LLP

By: _____
                    David L. Fiol
                    *Attorneys For Plaintiff Jack Francis Bruce*

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on each and all of the causes of action set forth in this Complaint.

DATED:  April 1, 2025                    BRENT & FIOL, LLP

By: _____
                    David L. Fiol
                    Attorneys for PLAINTIFF

FIRST AMENDED COMPLAINT; JURY DEMAND                    Case No.: 25-cv-01297-YGR